PHŒNIX IRON & STEEL CO. v. WILKOFF CO.

(Circuit Court of Appeals, Sixth Circuit. August 5, 1918.)

No. 3122.

1. CONTRACTS ⬤⟿23—OFFER AND ACCEPTANCE—CONDITION—"IT BEING UNDERSTOOD"—"AGREED"—"UNDERSTOOD."

The word "understood" in a contract is synonymous with "agreed," and the words "it being understood," in an answer to an offer, mean provided or on condition it is so agreed.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Agreed; It being Understood; First and Second Series, Understood.]

2. CONTRACTS ⬤⟿23—OFFER—CONDITIONAL ACCEPTANCE.

An acceptance of an option making no mention of the optionee's having a certain right, which he would have as a matter of law if the option should be accepted absolutely, but which acceptance is conditional on the optionor's agreeing that he should have such right, is a qualified acceptance, and such as to prevent the creation of a contract unless the optionor thereafter in some way agrees thereto.

3. CONTRACTS ⬤⟿23—OFFER AND ACCEPTANCE—FORM OF CONTRACT.

A difference between the offer and acceptance, as to the form of a contract, is just as effective to prevent the entering into the contract as one as to its substance.

4. SALES ⬤⟿168(2)—RIGHTS OF BUYER—PLACE OF INSPECTION.

A statute providing that, "unless otherwise agreed, when a seller tenders delivery of goods to the buyer he is bound, on request," to afford a reasonable opportunity for inspection, does not give a buyer of goods to be delivered to a carrier an absolute right of inspection at the point of shipment.

5. CUSTOMS AND USAGES ⬤⟿18—PLEADING AND PROOF.

In an action for breach of a contract alleged to have been made by telegrams set out, which were insufficient to create a contract, plaintiff cannot aid his case by proof of a custom not pleaded.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Action at law by the Phœnix Iron & Steel Company against the Wilkoff Company. Judgment for defendant, and plaintiff brings error. Affirmed.

---

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Hine, Kennedy & Manchester and Stephen S. Conroy, all of Youngstown, Ohio, for plaintiff in error.

Wilson & Wilson and Harrington, De Ford, Heim & Osborne, all of Youngstown, Ohio, for defendant in error.

Before WARRINGTON and KNAPPEN, Circuit Judges, and COCHRAN, District Judge.

COCHRAN, District Judge. The plaintiff in error' was plaintiff and the defendant in error defendant below. The action was to recover $202,500 as damages for breach of contract. The defendant denied the existence of the contract; and this was the sole issue in the case apart from that as to amount of damages. On trial before a jury verdict was rendered for defendant, pursuant to peremptory instruction given,' after plaintiff had introduced the evidence on which it relied to establish the contract,' and upon the ground that such evidence did not establish it. Judgment dismissing the petition was entered thereon, and it is therefrom that this writ has been sued out. Seven errors are assigned, but each in a different way raises the single question as to the correctness of the peremptory instruction.

The alleged contract related to one of two kinds of discard billets, made in the manufacture of high explosive shells. Such billets are cut-offs from billets rolled from ingots. Two are made from the top of each billet. The first is imperfect, in that it contains pipes and seams caused by the passage from the top of the ingot of gases formed by the hot steel. The second is apparently perfect, i. e., free from pipes and seams, and is made to insure that all imperfect steel has been eliminated. The remaining part of the billet is alone used in the manufacture of the shells. It was the latter kind of discard billets which was the subject-matter of the alleged contract.

The plaintiff and defendant are each engaged in buying and selling iron and steel products, the one in New York City and the other at Youngstown, Ohio. Plaintiff's claim was that the contract sued on arose from a telegram and confirming letter sent Monday evening, August 14, 1916, by defendant to it, granting an option, and a counter telegram sent Wednesday morning, August 16th, by it to defendant, accepting the option. It is not necessary to quote the confirming letter, as it contains nothing additional except a specification of the sizes of the billets, nor the formal parts of the telegrams. Defendant's telegram was as follows:

"For consideration of one dollar, receipt of which is hereby acknowledged, we hereby give you option, providing we receive your acceptance not later than Wednesday evening next, to purchase from us 15,000 tons discard billets free of pipes and seams, price $26.50 gross ton f. o. b. cars Youngstown, size of billets as confirmed by letter this evening."

Plaintiff's counter telegram was as follows:

"We accept option, and hereby purchase from you fifteen thousand tons billets on basis of terms and specifications of option given us, it being understood that we have the right to have our inspector at loading point as material is shipped. Acknowledge receipt of this message."

These two telegrams and defendant's confirming letter were filed as exhibits with the plaintiff's petition, and no reason occurs why the question as to whether a contract was thereby constituted might not have been raised by, and determined upon, demurrer to the petition. Subsequent telegrams, which passed between the parties down to August 22d, were introduced in evidence by plaintiff. They had no tendency to help out its case. Nor does it claim that they did. On the contrary, defendant claims that they show that the plaintiff as well as defendant did not regard that a contract had resulted from the previous communications. As it is not necessary to determine this, those telegrams, except one sent by defendant to plaintiff Wednesday evening the 16th upon receipt of plaintiff's telegram, are not quoted. That telegram was as follows:

"Billets on hand ready to ship. Your message satisfactory provided you make inspections Thursday or Friday this week. If billets satisfactory will then sign contract. Wire when your inspector will be here."

Inspection was made on Friday of the billets thus referred to and they were rejected.

The question as to the correctness of plaintiff's claim depends on whether its counter telegram was an absolute acceptance of the offer made by defendant's telegram and confirming letter. If it was not—if it was only a qualified acceptance thereof—no contract arose therefrom; for it is trite in the law that, in order for a contract to arise from the acceptance of an offer, the acceptance must be absolute and unqualified. The reason for this is thus stated in Wald's Pollock on Contract (3d Ed., by Williston) p. 43:

"For unless and until there is such an acceptance on the one part of the terms proposed on the other part there is no expression of one and the same common intention of the parties, but at most expression of the more or less different intentions of each party separately; in other words, proposals and counter proposals."

The question, therefore, whether, in any given case, an acceptance of an offer constitutes a contract may be viewed as one of identity. Do the offer and the acceptance each express one and the same intention, i. e., an assent to one and the same thing?

[1] Without doubt plaintiff's telegram on its face was a qualified, and not an absolute, acceptance of defendant's offer. It contained two sentences. The second called for an acknowledgment of its receipt. The first begins, it is true, by stating unqualifiedly that plaintiff accepted the option, and thereby purchased 15,000 tons billets "on the basis of terms and specifications of option"; but this statement was immediately followed by the words "it being understood that we have the right to have our inspectors at loading point as material is shipped," a matter of which defendant's communications made no mention. The word "understood" is synonymous with "agreed." 39 Cyc. 672, n. 90. And the words "it being understood" mean provided or on condition it is so agreed. The plaintiff in error practically concedes this. Its contention is that, even though this is so, yet the acceptance was in reality, an absolute and unqual-

ified acceptance. It attempts to make this out in this way. It maintains that had its telegram said nothing as to the right of inspection therein specified as defendant's communications did, and hence its telegram been really as well as on its face an absolute acceptance, it would, under the contract thus formed by law, have had such right of inspection. This being so, notwithstanding its acceptance was expressly made conditional on its being so agreed, it was in reality an absolute and unqualified acceptance. It bases its position that in that contingency it would have had such right on subdivision 2 of section 8427 of the General Code of Ohio, a part of which is known as the Williston Sales Act, in force also in New York, which provides as follows, to wit:

"Unless otherwise agreed, when the seller tenders delivery of goods to the buyer he is bound, on request, to afford the buyer a reasonable opportunity of examining the goods for the purpose of ascertaining whether they are in conformity with the contract."

It cites and relies on the cases of Turner v. McCormick, 56 W. Va. 161, 49 S. E. 28, 67 L. R. A. 853, 107 Am. St. Rep. 904, and Horgan v. Russell, 24 N. D. 490, 40 N. W. 99, 43 L. R. A. (N. S.) 1150, in support of its contention that on the basis that in such contingency it would have had such right, its acceptance was in reality absolute and unqualified. These two cases were both option cases. In each the option and the acceptance was in writing. In each also, though the writing of the optionee began with an absolute acceptance, it was not limited thereto. In the Turner Case the acceptance was followed by a request, and in the Horgan Case by a demand of something not within the option, and which therefore the optionee would not have been entitled to had the writing been limited to the absolute acceptance. In other words, the request in the one case, and the demand in the other, went beyond what the optionee would in that contingency have been entitled to. It was held in each case that a contract had been formed notwithstanding such request or demand. It was so held on the ground that the request in the one case, and the demand in the other, though contained in the same writing as the acceptance, had no relation thereto, and hence did not qualify it, but related solely to the matter of performance of the contract formed by the absolute acceptance which the optionor might comply with or not as he saw fit, just as much so as if the request or demand had been made subsequent to and not simultaneous with the acceptance. Possibly the correctness of the decision in the Horgan Case is not so certain as that in the Turner, on the idea that an agreement to do a certain thing and a demand of the contrary are mutually exclusive and not to be conceived of as parts of the same act. It is not entirely clear that plaintiff in error limits these two cases to a support of its contention as thus stated. Possibly it thinks that support therein can be found for the position that its telegram should be interpreted as meaning that it accepted defendant's offer absolutely, and requested, as the statute authorized, that it might make the inspection specified. Of course, if such was the true meaning of the telegram, then those cases are authority for the position that a con-

tract was thereby formed, and that whether or not plaintiff was entitled to make such inspection—more so, it would seem, if it was so entitled than if it was not. But those cases are no support whatever for the position that such was the true meaning of the telegram. No such meaning can be extracted from it without treating it vilely. The true meaning of the telegram is that the option was accepted provided or on condition that it was agreed that plaintiff should have such right. And this case has to be disposed of on this basis. Nor do they afford any support to the contention that, notwithstanding such was the true meaning of the telegram, it amounted to an absolute and unqualified acceptance of defendant's option on the ground that, had it said nothing as to the right of inspection therein specified, as defendant's communications did, and hence its telegram been on its face as well as in reality an absolute acceptance, it would, under the contract thus formed, have, by law, had such right. A decision that an absolute acceptance of an option followed in the same writing by a request or demand of something not within the option, and to which the optionee is not entitled, creates a contract, is not an authority for holding that one is created when the acceptance is on its face qualified by being made conditional on its being agreed that the optionee shall have a right not mentioned in the option if he would have had such right by virtue of the law had he absolutely accepted the option, on the ground that in such a case the acceptance, though such is its character on its face, is in reality an absolute acceptance. In one particular the question is the same in each instance. It is a question of interpretation. But they differ as to what is the subject-matter of interpretation. In the former instance it is the acceptance. According to its true meaning, is it absolute or qualified? Does the presence of the request or demand in the same writing as the acceptance cut it down from what it is in terms, i. e., an absolute acceptance to a qualified one, whereas, in the latter instance, it is assumed that the acceptance is on its face qualified and the subject of interpretation is the option? According to its true meaning, is it broad enough to include the qualification in the acceptance, so that in reality both, i. e., the option and the acceptance, express one and the same intention, i. e., an assent to one and the same thing? This is made plain by the two illustrations with which plaintiff in error attempts to enforce its contention.

Suppose, it suggests, that it had said in its counter telegram, "it being understood that said discard billets shall be free from pipes or seams," or that the option had been for 15,000 bushels of wheat, and to the acceptance thereof had been added, "it being understood that there shall be sixty pounds in each bushel of wheat." Clearly, in each case there would have been a contract entered into. This because, though the acceptance had been on its face qualified, there was in reality no qualification in that the condition was within the option. What the defendant offered in the one case was "discard billets free from pipes and seams," and what in the other it would have offered was 15,000 times 60 pounds of wheat, for a bushel of wheat consists of 60 pounds thereof. In fact, therefore, each party

expressed one and the same intention, i. e., an assent to one and the same thing.

But these illustrations, whilst they bring out clearly the question we have here, and make plain that the decisions relied on have no bearing on that question, cannot be said to conclude it. It calls for further consideration. We have given so much space to these two decisions because plaintiff in error is possessed of the idea that they are conclusive of this case, when in fact they have nothing to do with it.

To repeat, then, the question before us is this: If an optionee expressly qualifies his acceptance by making it a condition thereof that it is to be agreed that he is to have a right to which he would have by law been entitled had his acceptance been absolute, there being no reference to such right in the option, is the acceptance in reality absolute in that the option and the acceptance each express one and the same intention, i. e., an assent to one and the same thing, and that therefore a contract has been formed? In determining this question there is a dearth of authority bearing upon it. Counsel's research and our own has yielded none.

The case of Hussey v. Horne-Payne, 4 A. C. 311, is cited on behalf of plaintiff in error as having to do therewith, and it is claimed that it is favorable to its contention. There the subject-matter of the negotiations was certain real estate. In the course thereof the seller by letter offered the property at a certain price. In the answer thereto the buyer accepted the offer, adding, "subject to the title being approved by our solicitors." There had been negotiations preceding the sending of these letters, and in them the subject of how the price should be payable, in case agreement should be had as to the amount of it, had been considered, without any conclusion being reached, and, after their sending, this matter was further considered, with like result. The buyer thereupon brought suit for specific performance, claiming that a contract had resulted from the two letters, under which the price was payable upon performance by the seller. In the court of original jurisdiction, i. e., before the Vice Chancellor, this claim was sustained. On appeal to the Court of Appeals the decree was reversed on the ground that the acceptance was not absolute, but qualified, in that the words, "subject to the title being approved by our solicitors," in the acceptance, added a new term to the contract not contained in the offer. It interpreted these words to mean nothing more than provided a good title is shown, but provided our solicitors so determine, thus making them arbiters of that question. On appeal to the House of Lords this decision was affirmed, but not on this ground. It was affirmed on the ground that the two letters should not be considered apart from the entire negotiations, and, considering the entire negotiations, the parties had never come to a concluded agreement. It differed with the Court of Appeal as to the ground upon which it placed its decision. It construed the added words, though not without some doubt, to mean "provided a good title is shown," and assumed that, so construing them, a contract had been entered into apart from the consideration upon which it based its decision. As to the correctness of this

assumption there cannot be the slightest doubt. According to a true interpretation of the seller's offer, the qualification of the acceptance was within its meaning. What the seller offered to convey to the purchaser was a good title to the real estate which was the subject-matter of the negotiation, so that the offer and the acceptance expressed one and the same intention, i. e., an assent to one and the same thing. It was as if the purchaser had said, out of abundant caution, "I understand your offer to mean that I am to have a good title to the real estate, and if my understanding is correct I accept your offer." As such was the true meaning of the offer, a contract would have resulted from the acceptance had it not been for the consideration on which the House of Lords based its decision. Possibly this case is authority here for the position that, if the right of inspection specified by plaintiff in its acceptance was one which it would have had by law had it accepted defendant's option absolutely, and if, further, the acceptance had been made on condition simply that plaintiff should have such right, a contract would have been entered into. We are not disposed to say that it is not. If in such contingencies a contract would have been entered into, it must have been on the ground that, according to a true interpretation of defendant's option, such condition was within it, i. e., plaintiff was to have such right; so that it is true to say that the offer and acceptance each expressed one and the same intention, i. e., an assent to one and the same thing, to wit, that plaintiff was to have such right. In other words, it must be worked out in some way that the option expressed the intention that the plaintiff was to have the right of inspection at the loading point as the material was shipped. Possibly it can be worked out in this way. By the option defendant offered to sell plaintiff material of the character therein described. Thereby it expressed the intention that, if the option was accepted, it should be under obligation to deliver material of such description, and that plaintiff should not be under obligation to accept material tendered unless it was, and, as plaintiff could not determine whether such was the case without an inspection, that it should have the right of inspection. As to the place of inspection, it expressed the intention that plaintiff should have such right at such place as the law allowed. This is the extent to which it can be said that the expression of intention as to this matter went. It cannot be said that the option expressed directly the intention that plaintiff should have the right of inspection at the loading point as the material was shipped. This cannot be said on the idea that defendant is presumed to have known the law that it would have the right of inspection at such place. That one is presumed to know the law is a pure fiction, and a fiction has no place in a search for reality.

Whether in the two contingencies named a contract would have been formed on the basis of the reasoning suggested we do not find it necessary to determine. This is so because neither of these contingencies exists in this case. Take the second one first. It is that plaintiff in its counter telegram conditioned its acceptance on its having the right to make the inspection therein specified. Such was not

the condition set forth in the telegram. It was that it should be agreed that it should have such right. It called for an assent on defendant's part that it should have such right. Plaintiff did not interpret defendant's communications as contemplating that it should have such right. Hence it called for an assent on defendant's part thereto and made its acceptance conditional thereon. The second sentence of plaintiff's telegram is to be accounted for on this basis. An acknowledgment of receipt thereof, without more, would have been an assent on defendant's part to the condition. Had the second sentence been omitted it would not have been otherwise. The telegram would still have called for an assent on defendant's part which possibly would have been given by mere silence.

Defendant so interpreted plaintiff's counter telegram in its response thereto, whereby it postponed the matter of entering into a contract with plaintiff until the inspection should be had.

[2, 3] That an acceptance of an option making no mention of the optionee's having a certain right which he would have as a matter of law, if the option should be accepted absolutely, conditional on the optionor's agreeing that he should have such right, is a qualified acceptance, and such as to prevent the formation of a contract, unless the optionor thereafter in some way agrees thereto, would seem to be clear. By reason thereof it cannot be said that the option and the acceptance express one and the same intention, i. e., an assent to one and the same thing. They differ as to what shall be the form of the contract. It is the intention of the option that the form thereof shall be as therein set forth, whereas it is that of the acceptance that it shall embrace a term expressly giving the optionee such right. Such an acceptance in such a case is in effect a rejection of the option because of its form, i. e., it does not expressly embrace such a term in it. A difference as to the form of a contract is just as effective to prevent the entering into of a contract as one as to substance.

Nor is the right of inspection which plaintiff stipulated for in its acceptance the same right which it would have had had it made no mention thereof and accepted the option absolutely, and that even though the statute relied on by plaintiff in error applies in such a case as we have here. Apart from this statute, how does the matter stand? Had plaintiff so accepted the option, would it have had the absolute right to inspect the material at the loading point, i. e., the point of shippment, as it was shipped? Williston on Sales, § 480, says:

"The place of inspection is prima facie the place where the goods are delivered to the buyer."

He continues:

"The contract may, however, provide for inspection at some other place, and the nature of the contract may be such that, even in the absence of express provision, the law will hold some other place than that of delivery to be the point for inspection."

The reason why in such a case the law will so hold he thus sets forth:

"The chief ground for such an implication seems to be that a reasonable examination cannot readily be made at the place of delivery."

He then gives an instance where such an implication is made:

"It is on this ground that, where goods are shipped to the buyer, inspection need not be made on delivery to the carrier, though title passes at that moment, and the carrier becomes bailee for the buyer."

In note 69 to section 473 he gives a list of cases where it has been held that in such a case the buyer has the right of inspection on the arrival of the goods at their destination.

In Burdick on Sales, § 198, it is said:

"Although the place of inspection, in the absence of special agreement or custom, is presumably the place of delivery, yet the circumstances may show that such a place would be an unreasonable one, or that the parties did not contemplate an inspection there."

He cites, as an instance where the circumstances show that the place of delivery would be an unreasonable one, or that the parties did not contemplate an inspection there, the case of Pierson v. Crooks, 115 N. Y. 539, 22 N. E. 349, 12 Am. St. Rep. 831, which is one of the cases cited by Williston in note to section 470, and was a case of the ordering of goods of a specific quality by a distant purchaser of a manufacturer or dealer, with directions to ship them by a carrier, which is one of the most frequent commercial transactions, and the nature of that involved here.

These extracts from these authors assume that the place of delivery to the carrier on behalf of the buyer is properly characterized as place of delivery to the buyer or place of delivery simply, and lay down that the prima facie or presumptive rule that the place of inspection is at the place of delivery to the buyer has no application to such a delivery to him because of the unreasonableness of such a place of inspection in such a case. In Pope v. Allis, 115 U. S. 363, 6 Sup. Ct. 69, 29 L. Ed. 393, it is said that in such a case the buyer has "no opportunity to inspect the goods" until they reach their destination.

Mechem on Sales sets forth no prima facie or presumptive rule on the subject. In vol. 2, § 1377, he says:

"The place of inspection, in the absence of a contrary intention, must ordinarily be the place at which acceptance is due—as distinguished from the place of receipt where they are separate—the place at which the buyer is finally bound to accept or reject the goods."

This covers a case of delivery to a carrier on behalf of the buyer, and lays down that in such a case the place of inspection "must ordinarily" be at the destination of the goods, which is the place at which acceptance is due. In support of it he cites Pierson v. Crooks, supra, and Holt v. Pie, 120 Pa. 425, 14 Atl. 389, another of the cases cited by Mr. Williston in connection with that of Pierson v. Crooks.

Now, neither one of these authors deals with the question whether the buyer in such a case ever has a right of inspection at any other place than at the destination of the goods, as, for instance, at the place of delivery to the carrier on behalf of the buyer, and, if so, under what circumstances such right can be exercised. In Williston on Sales, § 473, it is said:

"It is often said in such cases that delivery to the carrier is delivery to the buyer, and it may be urged that the buyer should exercise his right of inspection before such delivery to him, 'and that, if he fails to do so, he waives his right; but whether or not the buyer is entitled to inspect the goods at the point of shipment, it is clear that the delivery to the carrier, and the transfer of the property thereby to the buyer, do not preclude a right of examination when the goods reach their destination."

He thus refers to the question whether the buyer has the right of inspection at the point of shipment, but passes it by without expressing any opinion on it. In section 480, above quoted, however, he says that inspection need not be made on delivery to the carrier, which implies that, though it need not be so made, it may be. Mechem, in saying that the place of inspection "must ordinarily" be the place at which acceptance is due, i. e., the destination of the goods, would seem to imply that it is not always limited thereto.

In Pierson v. Crooks, supra, Judge Andrews said:

"Where goods are ordered of a specific quality, which the vendor undertakes to deliver to a carrier, to be forwarded to the vendee at a distant place, to be paid for on arrival, the right of inspection, in the absence of any specific provision in the contract, continues until the goods are received and accepted at their ultimate destination."

In saying that the right "continues" until then he implies that it exists before then.

In the case of Lawder Co. v. Mackie Grocery Co., 97 Md. 1, 54 Atl. 634, 62 L. R. A. 795, where a seller in Baltimore contracted to sell a buyer in New Orleans a quantity of canned tomatoes "f. o. b. Baltimore," "terms cash," "buyer to give shipping instructions when requested by the seller," it was held that the buyer had no right to refuse payment for the goods until he had received and inspected them to see if they conformed to the contract, because he had agreed to pay cash for them on delivery to the carrier. It was said:

"There was no reason why the goods might not have been inspected at the seller's place of business in Baltimore rather than at the destination of the goods."

In that case, however, opportunity to inspect the goods after they reached their destination was not a condition precedent to the buyer's obligation to pay therefor, because he had agreed to pay cash on delivery to the carrier. And this was so whether or not he had the right to inspect at the seller's place of business in Baltimore.

These are all the references to the right of buyer in such a case to inspect before the goods reach their destination to which our attention has been called or that we have found. The rule that in such a case the buyer has a right of inspection at the place where acceptance is due, i. e., the destination of the goods, views the matter from the standpoint of the buyer. It is unreasonable that he should not have the right of inspection at such place. And this is so, ordinarily at least, because he has no reasonable opportunity of making an inspection at the point of shipment or elsewhere. To a degree it favors the buyer over the seller. The seller incurs the risk of having the goods, if rejected, on his hands at a distance from his

place of business. Of course he can avoid this by seeing that the goods are of the description called for by the contract. But, in view of this, it is open to claim that the buyer should not also have the right of inspection at the point of shipment if the existence of such right there will be injurious to the seller, particularly if his right of inspection at the place where the goods are destined is a condition precedent both to his obligation to pay for the goods or the freight for their transportation, which it ordinarily is and was, at least as to the price, under the option here. Williston on Sales, §§ 473, 478. An absolute right to inspect the goods at the point of shipment may be injurious to the seller in delaying him in shipping the goods, if not otherwise.

In Pierson v. Crooks, supra, Judge Andrews, in arguing against the seller's right to limit the buyer's right of inspection to the point of shipment said:

"It would be a most embarrassing and inconvenient rule, more injurious even to the dealer or manufacturer than to the purchaser, if delivery to the carrier was held to conclude the party giving the order from rejecting the goods on arrival, if found not to be of the quality ordered."

But at least the right of inspection at the point of shipment, if it exists at all in such a case as we have here, is not an absolute right. The buyer, if he desires to exercise such right, must first notify the seller and request that he be permitted to make such inspection. In the absence thereof, the seller is under no obligation to notify the buyer of his intention to make shipment and to hold it up until the buyer has an opportunity to be present. To this extent, at least, the buyer does not have an absolute right to inspect at the point of shipment.

[4] Coming, then, to the statute on which plaintiff in error relies, it may be a question whether it has any application to the case we have here. It applies "when the seller tenders delivery of goods to the buyer." In a sense, a delivery of goods to a carrier on behalf of a buyer is a delivery to the buyer. In the previous section it is provided that it shall be "deemed to be a delivery of the goods to the buyer." But it is not a delivery to the buyer in the same sense that a delivery to the buyer himself or to his servant is a delivery to him, and in previous sections of this Sales Act we find references to a delivery to the buyer, to a carrier, and to other bailees in the same connection, in which instances, of course, the words "delivery to the buyer" do not include a delivery to the carrier or other bailee on behalf of the buyer. But, assuming that this provision of the statute does apply here, it is not an absolute right of inspection which it confers. The seller is bound to afford the buyer a reasonable opportunity to examine the goods only on request of the buyer that he be permitted to make such inspection. There is the same qualification of the right to make inspection at the point of shipment which we have found is the least qualification thereof in the absence of the statute. What the plaintiff stipulated for in his telegram was not the right on request to make inspection at the loading point as the material was shipped, but the absolute right to do so. Giving the defendant's

option the broadest interpretation possible, it can be made to mean no more than that the plaintiff should on request have the right to make inspection at the loading point as the material was shipped. The plaintiff, by his counter telegram, in effect rejected this, and stipulated that he should have the right of inspection irrespective of any request from it. This necessitated that defendant before making shipment should notify plaintiff that it was about to do so, and give it a reasonable opportunity to be present and inspect, and would involve delay on defendant's part. If the plaintiff had accepted defendant's option absolutely, and any portion of the material was loaded when the option was sent, and had been started moving immediately on receipt of the acceptance, plaintiff would have lost the opportunity of inspecting it at the loading point without any ground of complaint of defendant. This would not have been the case had a contract been formed by the acceptance as it was. Defendant could not have shipped a pound without first notifying plaintiff and giving him reasonable opportunity to inspect it. It is true that, if his absolute acceptance had been followed by a request that he be permitted to inspect the material at the loading point, he could have prevented shipment of any portion without his first having such opportunity. But plaintiff's acceptance was not followed by such a request. He stipulated for an agreement that he should have the right of inspection absolutely when defendant had made him no such offer. It must be held, therefore, that the lower court did not err in giving the peremptory instruction.

On the trial the plaintiff offered to introduce evidence tending to show that at the time of the negotiations there was an established custom in and about Youngstown that, in a transaction involving the sale of discard billets, the purchaser had the right to have an inspector at the loading point, and that such custom was known to the parties. The court, upon objection by defendant, refused to permit the introduction of such evidence. Plaintiff in error urges that the judgment of the lower court should be reversed because of this refusal. There are two grounds why it should not be. Such refusal is not assigned as error. As heretofore stated, seven errors are assigned, but each in a different way raises the single question as to whether the giving of the peremptory instruction was erroneous. The only error which it can be claimed covered this refusal is the sixth. It is in these words:

"That said court erred in refusing and denying to this plaintiff the right to introduce its complete proof on all the issues in this cause, and in refusing to allow, and not allowing, the jury to determine said issues."

This assignment has no reference to the refusal of the court to permit the plaintiff to introduce such evidence as to custom, but merely to its action in giving the peremptory instruction after the plaintiff had introduced its evidence bearing on the existence of the contract without hearing its evidence as to damages. Usually a court hears all the evidence bearing on both the right of recovery and the amount thereof, and, if it thinks that the defendant is entitled to a

peremptory instruction, gives it at the close of all such evidence. This course was not pursued in the lower court, and that properly so. After hearing all the evidence introduced by plaintiff bearing on its right of recovery, it gave the peremptory instruction. Plaintiff intended by this assignment to raise the question whether the giving of the instruction was not premature and nothing else. It filed a motion for new trial. It did not urge the refusal to permit the introduction of this evidence as a ground of the motion. The third ground was:

"That the decision of the court in stopping the further trial of said case and directing the jury to bring in a verdict for the defendant is contrary to law."

[5] It is this same question that is raised by the sixth assignment of error.

But the lower court properly refused to permit the introduction of this evidence. If the existence of any such custom would have made a contract out of the communications which passed between the parties, it should have been alleged in plaintiff's petition. It was not. The petition based its claim that there was a contract solely on these communications. As no contract arose out of them, considered apart from any such custom, the petition was bad and subject to demurrer. A fact essential to make a petition good should be alleged.

Perceiving no error, the judgment of the lower court is affirmed.